THE STATE OF KANSAS, *Appellee,* v. J. W. COTNER, *Appellant.*

No. 18,140.

SYLLABUS BY THE COURT.

MEDICINE—*Practicing without Certificate—Penalties.* The statute providing that any person who shall practice medicine in this state without having received and recorded a certificate from the state board of registration and examination shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not less than fifty dollars nor more than two hundred dollars (Gen. Stat. 1909, § 8091) does not create a continuing offense involving a general course of customary conduct but penalizes each specific act of practice defined in the preceding section (Gen. Stat. 1909, § 8090).

Appeal from Smith district court. Opinion filed October 12, 1912. Affirmed.

*R. W. Turner,* of Mankato, *F. W. Mahin, I. M. Mahin,* and *W. E. Mahin,* all of Smith Center, for the appellant.

*John S. Dawson,* attorney-general, *S. M. Hawkes,* assistant attorney-general, and *L. C. Uhl, jr.,* county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of practicing medicine without having received and recorded a certificate from the board of medical registration and examination. The information contained fifteen counts and the defendant was found guilty upon eight of them. Of the eight, one was for opening an office for the reception and treatment of patients, placing a sign over the door indicating that the defendant was authorized to practice medicine, and thus advertising himself as qualified under the law to treat the sick and others afflicted with bodily infirmities. Two counts were for treating two persons on June 15, 1910. The remaining five counts were for treating different persons on different days between April 17, 1910, and January 15, 1911. The district court held, against objections seasonably made, that each count stated a separate offense, and sentenced the defendant to pay eight several fines. The question raised by this appeal is whether or not practicing medicine without a license is a continuing offense for which only a single penalty may be imposed for the entire time antedating the prosecution. This question is one of statutory interpretation.

The act relating to medical registration and examination (Laws 1901, ch. 254) establishes a standard of qualification to practice medicine and surgery, creates a board to ascertain the fitness of persons desiring to engage in such practice, and provides for the issuing and recording of certificates to applicants who are able to meet the statutory requirements. Section 6, as sub-

sequently amended (Laws 1908, ch. 63, § 1), reads in part as follows:

"Any person shall be regarded as practicing medicine and surgery within the meaning of this act who shall prescribe, or who shall recommend for a fee, for like use, any drug or medicine, or perform any surgical operation of whatsoever nature for the cure or relief of any wounds, fracture or bodily injury, infirmity or disease of another person, or who shall use the words or letters "Dr.," "doctor," "M. D.," or any other title in connection with his name, which in any way represents him as engaged in the practice of medicine or surgery, or any person attempting to treat the sick or others afflicted with bodily or mental infirmities, or any person representing or advertising himself by any means or through any medium whatsoever, or in any manner whatsoever, so as to indicate he is authorized to or does practice medicine or surgery in this state, or that he is authorized to or does treat the sick or others afflicted with bodily infirmities, . . . nor shall anything in this act apply to the administration of domestic medicines, nor to prohibit gratuitous services." (Gen. Stat. 1909, § 8090.)

Section 7 reads as follows:

"From and after the 1st day of September, 1901, any person who shall practice medicine and surgery or osteopathy in the state of Kansas without having received and had recorded a certificate under the provisions of this act, or any person violating any of the provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not less than fifty dollars nor more than two hundred dollars for each offense, and in no case wherein this act shall have been violated shall any person so violating receive compensation for services rendered. It shall be the duty of the secretary of the state board of registration and examination to see that this act is enforced." (Gen. Stat. 1909, § 8091.)

It is elementary that a single offense can not be divided into several parts, whether of time or of conduct, for the purpose of basing separate prosecutions upon the various divisions. A nuisance resulting from the

The State v. Cotner.

execution of a single design will support but one conviction, although maintained for a number of days or weeks or months, and a single beating entails but one punishment although the event include the striking of a number of blows. But the question whether a statute is directed against a general course of conduct involving customary or habitual acts, or against the individual acts themselves, considered in isolation, is frequently quite difficult of determination. There are no specific rules which solve the problem to a certainty, and the legislative intention must be gained from all intrinsic and extrinsic indications which the law recognizes as helpful to correct interpretation. Some of the cases, however, yield to classification under general principles.

The act of 29 Car. II, c. 7, s. 1, 8 Stat. at Large, p. 412, providing that "no tradesman . . . or other person whatsoever shall do or exercise any worldly labour, business, or work of their ordinary callings upon the *Lord's day,* . . . works of necessity and charity only excepted," was violated but once by a baker who made six sales of "small hot loaves of bread, commonly called rolls," on a single Sunday. (*Crepps v. Durden,* Cowper's Reports, 640.) The opinion in this case, decided in 1777, was delivered by Lord Mansfield, who said:

"If the act of parliament gives authority to levy but one penalty, there is an end of the question, for there is no penalty at common law. On the construction of the act of parliament, the offence is, 'exercising his ordinary trade upon the Lord's day;' and that, without any fractions of a day, hours, or minutes. It is but one entire offence, whether longer or shorter in point of duration; so, whether it consist of one, or of a number of particular acts. The penalty incurred by this offence is five shillings. There is no idea conveyed by the act itself, that, if a taylor sews on the Lord's day, every stitch he takes is a separate offence; or, if a shoe-maker or carpenter work for different customers at different times on the same Sunday, that those are so many

separate and distinct offences. There can be but one entire offence on one and the same day: and this is a much stronger case than that which has been alluded to, of killing more hares than one on the same day: killing a single hare is an offence: but the killing ten more on the same day will not multiply the offence, or the penalty imposed by the statute for killing one. Here, repeated offences are not the object which the legislature had in view in making the statute: but singly, to punish a man for exercising his ordinary trade and calling on a Sunday."

This decision has been generally accepted as correctly interpreting "Sunday Laws" (see *Friedeborn v. Commonwealth,* 113 Pa. St. 242, decided in 1886) and is manifestly sound. The statute of Charles was intended to prevent the desecration of the Sabbath as a day for religious practices and observances. In the United States such statutes are justified on broader grounds, but the purpose is to secure immunity for the first day of the week from the stress and turmoil of ordinary secular employments. The usual avocations of men are not condemned for any inherent unwholesomeness. They suffer no metamorphosis on Saturday night. The legislature looks to the protection of the day, and no matter how the Sabbath-breaker conducts himself on a given Sunday, he has merely done violence to the character of that day.

The keeping of forbidden places, such as gambling houses, disorderly houses, and places for the illegal sale of liquors, and maintenance of forbidden relations such as unlawful cohabitation, constitute continuing offenses. The same is true of abandonment, the gist of which is the act of separation. (*State v. Dunston,* 78 N. C. 418.) In such cases the statutes usually concern themselves with the obnoxious place, or with the status created, and not with plurality of acts, occasions, or objects. The case of *In re Snow,* 120 U. S. 274, belongs to this class. Snow was charged with un-

lawfully cohabiting with more than one woman in three indictments for separate periods which, taken together, covered a continuous period of two years and eleven months. In the opinion the court said:

"The offense of cohabiting with more than one woman, in the sense of the section of the statute on which the indictments were founded, may be committed by a man by living in the same house with two women whom he had theretofore acknowledged as his wives, and eating at their respective tables, and holding them out to the world by his language or conduct, or both, as his wives, though he may not occupy the same bed or sleep in the same room with them, or either of them, or have sexual intercourse with either of them. The offense of cohabitation, in the sense of this statute, is committed if there is a living or dwelling together as husband and wife. It is inherently a continuous offense, having duration, and not an offense consisting of an isolated act. . . . The division of the two years and eleven months is wholly arbitrary. On the same principle there might have been an indictment covering each of the thirty-five months, with imprisonment for seventeen years and a half and fines amounting to $10,500, or even an indictment covering every week, with imprisonment for seventy-four years and fines amounting to $44,400; and so on, *ad infinitum,* for smaller periods of time. It is to prevent such an application of penal laws, that the rule has obtained that a continuing offense of the character of the one in this case can be committed but once, for the purposes of indictment or prosecution, prior to the time the prosecution is instituted. Here each indictment charged unlawful cohabitation with the same seven women; all the indictments were found at the same time, by the same grand jury, and on the testimony of the same witnesses, covering a continuous period of thirty-five months; and it was the mere will of the grand jury which divided the time among three indictments, and stopped short of dividing it among thirty-five, or one hundred and fifty-two, or even more." (pp. 281, 282.)

For nuisance cases Wharton has made the very

clarifying generalizations which conclude the following paragraph:

"No matter how long a time an offence may take in its perpetration, it continues but one offence. An explosive package, for instance, may be sent from Maine to California, and may take weeks in the transit, but the transmission is a single act. Difficult questions, indeed, may arise, to be hereafter noticed, when gas or liquor is tapped by a pipe through which there is a continuous passage for days. But whatever may be the conclusion as to such cases, it is settled that nuisances, when distinct impulses are given at intermittent successive times, may be the object of successive prosecutions. The distinction is this: when the impulse is single but one indictment lies, no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie." (1 Wharton's Criminal Law, 10th ed., § 27, p. 35.)

When penal statutes allow civil actions to recover smart money from wrongdoers it is generally held that but one penalty can be imposed for all delinquencies occurring prior to the institution of suit unless the statute should expressly provide for a recovery for each offense.

*Fisher v. N. Y. C. & H. R. R. R. Co.,* 46 N. Y. 644; penalty for charging more than legal fare.

*Parks v. Railroad Company,* 81 Tenn. 1; penalty for failure to announce stations.

*Sturgis v. Spofford,* 45 N. Y. 446; penalty for employing an unlicensed pilot.

The theory of such statutes is that actions for penalties, often incurred inadvertently, or under a claim of right, or in matters of small individual consequence, will call attention to the improper acts or practices, give the parties prosecuted an opportunity to desist and lead to discontinuance; and that their purpose would be thwarted and they would be turned into measures of oppression if informers were allowed to open books of account of penalties and delay prosecu-

The State v. Cotner.

tion until ruinous sums were aggregated. In the Tennessee case just cited a strong dissenting opinion was filed, and in the New York pilot case the hazard to every vessel piloted by an unqualified person was not referred to.

The act of 11 and 12 Victoria, c. 63, for the promotion of the public health (88 Stat. at Large, pp. 451, 479), authorized the inspector of nuisances to inspect meat shops and seize meat unfit for food and destroy it. The act further provided as follows:

"And the Person to whom such Animal, Carcase, Meat, Poultry, Game, Flesh, or Fish belongs, or in whose Custody the same is found, shall be liable to a Penalty not exceeding Ten Pounds for every Animal or Carcase, Fish, or Piece of Meat, Flesh, or Fish, or any Poultry or Game, so found, which penalty may be recovered before Two Justices in the Manner hereinafter provided with respect to Penalties the Recovery whereof is not expressly provided for."

In the case of *In re Hartley and others,* 31 L. J. Rep., n. s., 232, it was held, under this statute, that each exposure of a piece of bad meat constituted a separate offense and that four prosecutions might be sustained for as many pieces of such meat found in the same stall on the same day.

The copyright act of 25 and 26 Victoria, c. 68, s. 6, 102 Stat. at Large, p. 346, provided that every person not the proprietor of the copyright who shall sell any copy or repetition of a copyrighted work "for every such offence shall forfeit to the Proprietor of the Copyright for the Time being a Sum not exceeding Ten Pounds." In the case of *Ex parte Beal,* L. R., 3 Q. B. 386 (1867-1868), the statute was interpreted as follows:

"The only other question is, whether the offender is liable to a penalty for every copy sold, or only on each contract to sell. In point of fact twenty-six copies were sold, but they were sold in two parcels, thirteen copies in each; and it has been contended that there were but two offences. . . . In the present case the words are, such person for every such offence shall forfeit to

the proprietor of the copyright for the time being a sum not exceeding 10 £. It is quite clear that this imposes a penalty for every copy sold; a different construction would result in an absurdity, and defeat the intention of the legislature. . . . The legislature were dealing with an offence which was likely to be committed wholesale, and they have used words meaning that the sale of every copy shall be an offence, and if ten copies be sold at one time, ten offences are committed and the offender may be punished for each separately." (p. 393.)

In the case of *Deyo v. Rood,* (N. Y.) 3 Hill, 527, overseers of the poor recovered several penalties for the violation of a statute providing that, "Whoever shall sell any strong or spirituous liquors &c. without having a license &c. shall forfeit twenty-five dollars." It was held that the offense was not a continuing one and that the penalty might be recovered for each sale.

In the case of *Commonwealth v. Respass,* 21 Ky. Law Rep. 140, 50 S. W. Rep. 549, the principle stated by Wharton was applied. Four indictments were returned against Respass for four nuisances committed by permitting persons to assemble in a house under his control and there bet on horse races. Each indictment was for one month's time and the four covered a period from March to July. In the opinion the court said:

"It appears in this case that appellee's business was only operated in the afternoon, from about 2 P. M. to 5 P. M. each day; that he had 15 or 20 employees there daily to wait on the crowd; and that about 175 or 200 people would meet every afternoon at appellee's house in this way, except on Sunday, and engage in betting on horse races. The court can not see that this was the product of a single impulse, and, when the commonwealth elected to confine each indictment to certain limits of time, the proof should be confined to the period so specified, and a conviction under an indictment for one period is no bar to an indictment for a different period." (p. 550.)

It is not the purpose of this opinion to make an exhaustive review of the authorities. It is desired merely

to illustrate the manner in which the subject under consideration has been dealt with.   Perhaps that end has been sufficiently attained, but two additional cases, one English and one American, quite favorable to the defendant should be noticed.

The Apothecaries Act, 55 Geo. III, c. 194, s. 20, 55 Stat. at Large, p. 1116, made provision for the examination and certificating of apothecaries and enacted that, "If any Person" shall "act or practise as an apothecary in any Part of England or Wales without having obtained such Certificate as aforesaid, every Person so offending shall for every such Offence forfeit and pay the Sum of Twenty Pounds." The Apothecaries Company, having the right to recover penalties incurred under the act, sued the defendant in three actions for three penalties for three alleged offenses committed on the same day in attending, advising, and prescribing and supplying medicines, to three different patients.   The trial judge held that the act pointed to an habitual, or at all events to a continued course of conduct rather than to an isolated act, and consequently that but one offense had been committed.   Judgment was given for but one penalty, and on appeal the judgment was sustained.   (*Apothecaries Company v. Jones,* L. R. 1893, 1 Q. B. 89.)   Two opinions were delivered. Pollock, B., considered the case analogous to that of *Crepps v. Durden,* Cowper, 640.   In response to the suggestion that administering medicine to different patients involved an offense against each one and that such conduct could scarcely be compared to selling different rolls, it was said that while the remark was of great force, and might afford ground for amending the act, the offense committed was identical with that of the Sunday Trading Act.   Hawkins, J., based his judgment largely on *Crepps v. Durden.*   He further argued that to "practice" a calling does not mean to exercise it on an isolated occasion but to exercise it frequently, customarily, or habitually; and that it could not have

been the intention to penalize one who should "act" occasionally as an apothecary more heavily than one who practiced regularly.

The laws of Kentucky provided for the incorporation of the Kentucky State Dental Association, which was granted power to issue certificates to practice dentistry. The penal provision of the act reads as follows:

"Any person who shall, in violation of this act, practice dentistry or dental surgery in the state of Kentucky, for fee or reward, shall be subject to indictment by the grand jury of the county in which the offense is committed; and, upon conviction, shall be fined in the sum of not less than fifty dollars nor more than two hundred dollars for each offense." (2 Acts of Ky. 1885-1886, ch. 1017, § 4, p. 524.)

Under this act three indictments were returned against one Wilson, each covering the same period of time but naming different patients. In *Wilson v. Commonwealth,* 119 Ky. 769, 82 S. W. 427, it was held that but one offense had been committed and that but one penalty could be imposed. The court said:

"The question presented is whether or not the offense denounced by the statute is of such continuous nature as to subject the violator to only one conviction for the whole period of time next before the institution of the prosecution, or is it of such a character as that each act of practice constitutes a separate offense? It is apparent, upon very slight consideration, that if each time an unregistered dentist pulls a tooth he is subject to a fine of from $50 to $200, in a short while these would aggregate so large a sum as to make payment impossible, and, as a result, the defendant might lie in jail a large part of his life. Such a conclusion is not to be reached, unless constrained by the very letter of the statute." (p. 773.)

The remainder of the opinion is devoted to a presentation of the cases of *Apothecaries Company v. Jones, Crepps v. Durden,* and *In re Snow,* which were regarded as of controlling authority. The fact that every time an unregistered dentist pulls a tooth the

The State v. Cotner.

patient's life may be endangered by an unclean operation does not appear to have occurred to the court.

The act of this state relating to medical registration and examination is one of a series devoted to the con-. servation of the public health.  Among them is the act creating boards of health, state and local, and conferring upon them extensive powers and duties; the pure food law; acts relating to vital statistics, epidemics and quarantine, the analysis of food products, nuisances, water. supply and sewage, tuberculosis and dangerous diseases; the pharmacy act; and some others.  Several of these statutes make onerous requirements of the members of the medical profession in the interest, not of their patients for the time being, but of the public welfare, and it is a matter of general concern that the persons who are to be responsible for the discharge of these obligations should be known and their qualifications to render the public service demanded of them should be ascertained.  Beyond this, the state is especially interested in the protection of sick people from empiricism and from charlatanry; from the quack who is ignorant of healing and the faker who is an adept at swindling.  Consequently the legislature has provided that anyone proposing to practice medicine must apply to the state board of medical registration and examination for leave, prove his qualifications, obtain a certificate of authority and register it in the county of his residence, before assuming the duties and exercising the privileges of a physician.  Should he undertake to practice medicine without a certificate he is guilty of a crime and liable to punishment.  The subject is of such moment and gravity and the legislature has dealt with it so carefully and so seriously that a plea that the taking out of a certificate had been inadvertently overlooked would be an affront.  Unless he be of weak mind, whoever ignores the statute does so willfully and without any reason to expect acquiescence or toleration on the part of the authorities.  Enforcement of the law

is not left to private initiative or the prompting of mercenary motives. That duty is expressly enjoined upon the secretary of the board of registration and examination, and all other law officers may be expected to coöperate, as in other cases of infractions of the criminal law. A prosecution is not a mere admonition to take out a certificate or else desist from practice. Its purpose is punishment. Dilatoriness in the commencement of proceedings to the extent that they may result in oppression is not to be anticipated, and the argument of the Kentucky court in the dentist's case may be passed by.

Unlike the British Apothecaries Act, the statute has not remitted us to any general understanding of the meaning of the word practice. By virtue of the legislative definition, to prescribe, for a fee, any drug for the relief of any disease of another person, is to practice medicine. It is not necessary that this be done frequently, customarily, or habitually. One isolated instance is sufficient and the penalty is affixed to each offense. The same is true of surgical operations and other specific acts denounced by the statute. Besides this, any fair consideration of the mischief which the legislature sought to remedy leads to the conclusion that the state board of medical registration and examination was not created for the simple purpose of attaching its badge to professional careers. The life, health, and financial resources of individual men, women, and children were to be protected from ignorance and imposture. Each repetition is a new peril, and instead of applying to a continuous course of conduct, the statute specifies and condemns each impulse, to the very end that it may not unite with others in swelling a common stream of action. This case, therefore, resembles the one in which the exposure of each piece of unwholesome meat was penalized rather than the Apothecaries case or *Crepps v. Durden.* If the statute be drastic because the offense may be committed against

each patient practiced upon, the fact may, in the phrase of Baron Pollock, afford ground for amending the act.

The Snow case—cohabitation with more than one woman—applies to the first count upon which the defendant was convicted. No matter how diverse or long continued Snow's criminal conduct might be, he merely created the status of plural cohabitation and that status merely continued. Likewise when the defendant opened an office with a doctor's sign over the door he established a place the criminal consequence of which merely persisted. Any attempt to split up this persistence into distinct periods of time would be purely arbitrary. But there is nothing arbitrary in taking separate account of the separate cases of the different individuals treated by the defendant on June 15.

The judgment of the district court is affirmed.